# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00704-CV

**Karen Kuester, Appellant**

**v.**

**Ivor Green, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
### NO. D-1-FM-12-006430, HONORABLE PAUL R. DAVIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In two issues, Karen Kuester appeals from a summary judgment in favor of Ivor Green in a suit for divorce involving an alleged common-law marriage. We will affirm.

## BACKGROUND

Kuester and Green started dating in 2001. In 2002, Kuester ended the relationship because Kuester wanted to get married and Green did not. Green later asked Kuester to get back together, and in 2004, Kuester moved in with Green. Kuester and Green never participated in a formal wedding ceremony, and no Texas marriage license was ever issued to them.

In May 2010, Kuester and Green ceased living together. Over two years later, Kuester sued Green for divorce and for additional causes of action. Kuester asserted that she had been in a common-law marriage with Green since 2004. Green denied that he had ever been married to Kuester.

Green filed a motion for summary judgment on the divorce claim, which the trial court granted. The court then severed all of Kuester's claims not governed by the Texas Family Code into a separate cause of action. This appeal from the trial court's summary judgment followed.

## STANDARD OF REVIEW

We review a trial court's grant of summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When, as here, a trial court grants summary judgment but does not specify the grounds for granting the motion, we must uphold the judgment if any of the grounds asserted in the motion and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). In reviewing a trial court's ruling on summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve all doubts in the nonmovant's favor. *Id.* To prevail on a traditional motion for summary judgment, the moving party must establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c).[1]

---

[1] Kuester responded to Green's motion for summary judgment as though Green had asserted only no-evidence grounds and raises only no-evidence grounds on appeal. *See* Tex. R. Civ. P. 166a(i). Because he filed a motion for summary judgment on traditional grounds, Green claims that Kuester has waived her right to complain on appeal that the trial court erred in granting this motion. We will assume, without deciding, that Kuester has not waived her ability to respond to Green's traditional grounds, and we will consider whether Kuester has raised a genuine issue of material fact on each element of her claim. To the extent Green's motion also raised no-evidence grounds, we need not consider them because the traditional grounds are dispositive. *See Poag v. Flories*, 317 S.W.3d 820, 825 (Tex. App.—Fort Worth 2010, pet. denied) ("Although when both no-evidence and traditional summary judgment motions are filed we usually address the no-evidence motion first, here we will review the propriety of granting the traditional summary judgment first because it is dispositive.") (citation omitted).

2

A defendant who conclusively negates at least one of the essential elements of a cause of action is entitled to summary judgment. *See Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013).

"An informal or common-law marriage exists in Texas if the parties (1) agreed to be married, (2) lived together in Texas as husband and wife after the agreement, and (3) represented to others that they were married." *Burden v. Burden*, 420 S.W.3d 305, 308 (Tex. App.—Texarkana 2013, no pet.); *see* Tex. Fam. Code § 2.401(a)(2). "A common-law marriage does not exist until the concurrence of all three elements." *Eris v. Phares*, 39 S.W.3d 708, 713 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

We also note that Kuester sued Green for divorce more than two years after their separation. Therefore, there is a rebuttable presumption that they were never married. *See* Tex. Fam. Code § 2.401(b) (providing that if a proceeding in which an informal marriage is to be proved "is not commenced before the second anniversary of the date on which the parties separated and ceased living together, it is rebuttably presumed that the parties did not enter into an agreement to be married"). This presumption requires the trier-of-fact to conclude, in the absence of evidence, that the parties never agreed to be married, and, at the summary-judgment phase, "the resisting party must come forward with evidence sufficient to neutralize the effect of the presumption in order to properly allow the case to proceed to trial." *Amaye v. Oravetz*, 57 S.W.3d 581, 584 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

## DISCUSSION

Green produced the following summary-judgment evidence:

3

- Green's affidavit asserting that he never agreed to be married to Kuester, never lived with Kuester as husband and wife, and never held himself out as married to Kuester.

- A general warranty deed showing that in 2004, after moving in with Green, Kuester sold her home and indicated that she was "an unmarried person."

- A trust agreement Green executed in August 2004, after Kuester had moved into his residence, which contained the following statement: "For purposes of this Trust Agreement, [Green] and [Kuester] shall not be considered married, formally or informally, unless they are formally married after the issuance of a wedding license and pursuant to a formal wedding ceremony conducted by an authorized person pursuant to the laws of any applicable jurisdiction." The trust agreement provided for Kuester in different ways depending on whether Kuester and Green were married, living together, or separated at the time of Green's death.

- IRS income tax returns indicating that Kuester designated her filing status as "Single" for the years 2004 and 2007–2010.[2] Kuester also amended her 2009 tax return to claim a first time home buyer's credit, and she indicated on the form that she was single.

- An email from 2006 in which Kuester sought legal counsel to draft a prenuptial agreement. Kuester wrote the following: "I'm looking for someone to explain my rights as a 'domestic partner', write a prenup for me & Ivor (whose attys will then go over), and a will for me." In a later email, Kuester wrote: "Do you want to do the prenup and I'll still go with Sarah for the domestic partnership rights? The reason I'm still pursuing that is because I still want to know where I stand in case he gets cold feet. Again."

- Kuester's will, which was executed in 2007 and stated that she was "not married."

- A general warranty deed showing that in 2009 Kuester purchased a home in her name alone.

- A police report showing that in 2010, when Kuester and Green separated, the police were summoned after Kuester accidentally discharged a firearm.

---

[2] Kuester's tax returns for other years do not appear in the record.

4

Kuester told the police that "she and her 'life partner' were going thr[ough] a sep[a]ration."

- Kuester's revised will, which was executed in July 2011 and stated that she was "not married." Kuester executed another revised will in October 2011 and again indicated that she was "not married."

- A 2011 email from Kuester to Green, in which Kuester told Green that she was going to keep the "we are not going to get married" ring he had given her.

- Medical forms from 2012, in which Kuester indicated that she was single.

This evidence conclusively negates the first element of Kuester's claim because it establishes that Green and Kuester did not agree to be married. Kuester refers to herself as single in a number of documents completed throughout the course of their relationship. More importantly, these documents are accompanied by Green's 2004 trust agreement, in which he explicitly stated that he did not consider himself to be and should not be considered married to Kuester unless they were formally married at a later date, and a 2006 email from Kuester, in which Kuester sought a prenuptial agreement because she believed that Green may continue to have "cold feet" about getting married. Kuester's email implies that the couple was not presently married and expresses doubts that they ever would be.

In response to Green's motion, Kuester submitted the following evidence:[3]

- An affidavit in which Kuester asserted the following:

---

[3] Green objected to certain evidence submitted by Kuester, and the trial court sustained those objections. In her second issue on appeal, Kuester challenges the court's evidentiary rulings. However, we conclude that any error was harmless because it did not cause the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a). We consider the excluded evidence in our discussion below to illustrate this point. We therefore overrule Kuester's second issue.

- When Kuester and Green began dating, Green was Kuester's supervisor.

- After dating Green for about one year, Kuester ended the relationship because Green initially showed hesitation about marrying her.

- Green later initiated a conversation with Kuester in which he stated that he wanted to get back together. Green made several promises, including that they were to be married and that he would take care of Kuester for the rest of her life. Green and Kuester agreed that they would sell their individual houses and buy a new home together. Kuester stated in her affidavit, "I left our meeting that day believing that we had just agreed to and committed to spending the rest of our lives together as husband and wife."

- About a year later, Kuester moved into Green's residence. She also quit her job because Green wanted her "to fill the more traditional role of being a domestic housewife." Kuester was willing to leave her job and benefits because Green had expressed that they would be together forever and that he would take care of her even if they "got sick." Kuester stated, "I believed he was communicating to me that we were informally married, and that we were, in fact, married."

- Relying on Green's assurances, Kuester sold her home in 2004. She also disposed of many of her personal belongings.

- Kuester visited Green's mother in her final days and, after her death, comforted Green's father.

- Kuester and Green were close with each other's families. Green's father referred to Kuester as being "like a daughter," and Kuester's niece referred to Green as "Uncle Ivor." Green's grandchild referred to Kuester as "Grandma."

- "There are also many instances where Ivor is referred to as my husband, either by me or by a member of the community."

- Green purchased an engagement ring and wedding ring for Kuester, and Kuester wore them almost every day.

- Kuester took care of their home and was an authorized user on one of Green's accounts.

6

- Kuester and Green "went everywhere together" and "did everything together." They spent holidays together, vacationed together, and shopped together.

- At a social gathering, a family friend asked Green if she could put Kuester's "name in ink" in her address book, and Green said "yes."

- Kuester oversaw an expensive remodel of their home.

- When Kuester began to suffer from physical and mental illness, Green removed her possessions from the home. When Kuester attempted to reenter the house, Green called the police and told them that Kuester was not his wife.

- "Prior to Ivor throwing me out, I knew that Ivor had agreed to and that we were living as husband and wife. But, I was concerned that we had not been formally married, with a license. I was concerned at times about the legal consequences and difficulties should Ivor change his mind concerning our relationship. I approached Ivor several times about formalizing our marriage. He always replied, 'We don't need a ceremony to show our love.' He would also say, 'Don't worry, I am going to take care of you for the rest of your life'."

- "I always felt that we were married. Ivor always confirmed that belief."

- "Ivor never once said he did not want to marry me. He never once said that we were not married. He did say that I did not need to worry, that we would always be together, and that he would always love, care, and support me."

- "I always knew we were married—that was our agreement and that was how we lived our lives."

- A series of emails between Kuester and a jeweler in which Kuester referred to her "computer genius husband" and referred to Green's relatives as her "daughter-in-law and grandson," and the jeweler referred to Green's grandchild as Kuester's "grandson."

- An email from Kuester to a Cathy Negrel in which Kuester refers to Green as her husband.

- An email from a Cindy Kunkel to Kuester in which Kunkel states, "I hope you and your husband had a lovely weekend."

- An email from Kuester to a hotel in which Kuester states, "My husband loved the bed so much he wants us to buy one just like it."

- Architectural blueprints for the remodel of the home, which contain the label, "Mr. Green & Mrs. Kuester."

We conclude that Kuester has failed to raise a genuine issue of material fact as to whether she and Green agreed to be married. Kuester has not presented more than a scintilla of evidence that she and Green "intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife." *See Eris*, 39 S.W.3d at 714; *see also Burden*, 420 S.W.3d at 308 ("To establish that the parties agreed to be husband and wife, it must be shown that they intended to create an immediate and permanent marriage relationship, not merely a temporary cohabitation that may be ended by either party."). Instead, Kuester has presented evidence only that she wished to marry Green, that Green promised her that they would get married, and that Green assured Kuester that he would take care of her for the rest of her life. Although an agreement to marry may be established by circumstantial evidence, *see Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993), "an occasional uncontradicted reference to a cohabitant as 'my wife' or 'my husband' or 'mine' will not prove a tacit agreement to be married without corroboration." *Id.* at 932 (quoting Joseph W. McKnight, *Family Law: Husband and Wife*, 44 Sw. L.J. 1, 3 (1990)). While Kuester may have subjectively believed that she was married to Green, there is no evidence that Green believed they were married, and the summary-judgment record is filled with conclusive proof that Kuester and Green never reached an accord in that regard. Kuester

8

has failed to overcome the statutory presumption that they were never married, and the trial court did not err in granting summary judgment to Green on this basis.

We also conclude that Kuester has failed to produce sufficient evidence to raise a fact question as to whether she and Green held themselves out as married. "The element of holding out requires more than occasional references to each other as 'wife' and 'husband.'" *Smith v. Deneve*, 285 S.W.3d 904, 910 (Tex. App.—Dallas 2009, no pet.). Kuester submitted evidence that Green purchased rings for her and that Kuester wore the rings often. However, this evidence alone does not raise a fact question. *See id.* (holding that "Smith did not adduce evidence of holding out sufficient to raise a genuine fact issue" even though Smith testified that Deneve had accepted his ring and they had been introduced by others as husband and wife). In addition, Kuester asserted in her affidavit that she and Green were close to each other's families, and she produced emails in which Green is referred to as her husband. However, Kuester did not indicate the frequency of the representations of Green as her husband. *See Castillon v. Morgan*, No. 05-13-00872-CV, 2015 WL 1650782, at *4 (Tex. App.—Dallas Apr. 14, 2015, no pet.) (mem. op.) ("She testified that she and Castillon 'represented ourselves as married,' but she presented no evidence of the frequency of this representation."). Nor did Kuester produce any evidence that Green himself ever referred to her as his wife. *See Lee v. Lee*, 981 S.W.2d 903, 907 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (noting that only one party held out as married); *Winfield v. Renfro*, 821 S.W.2d 640, 651 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (same). Nor did Kuester bring forward a single friend or a member of either family to testify that she and Green held themselves out as married. *See Ex parte Threet*, 333 S.W.2d 361, 364–65 (1960) ("Under the Texas decisions, there can be no secret

9

common law marriage as such.  The secrecy is inconsistent and irreconcilable with the requirement of a public holding out that the couple are living together as husband and wife.").

Kuester failed to raise a genuine issue of material fact concerning two of the required elements of a common-law marriage.  Indeed, both Green's and Kuester's evidence demonstrates that, far from agreeing to marry Kuester, Green carefully structured their relationship to avoid marriage or any unconditional commitment.  Therefore, the trial court did not err in granting summary judgment in Green's favor.  Accordingly, we overrule Kuester's first issue on appeal.

## CONCLUSION

We affirm the trial court's grant of summary judgment.

_____

Scott K. Field, Justice

Before Justices Puryear, Goodwin, and Field

Affirmed

Filed:  August 20, 2015

10