**AFFIRM; and Opinion Filed February 20, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00165-CV

### IN RE ESTATE OF LINDA JEAN WHETSTONE, DECEASED

**On Appeal from the Probate Court No. 3**
**Dallas County, Texas**
**Trial Court Cause No. PR-17-00142-3**

## MEMORANDUM OPINION
Before Justices Brown, Schenck, and Pedersen III
Opinion by Justice Brown

The primary issue in this appeal is whether there is legally and factually sufficient evidence

to support the probate court's determination that no informal marriage existed between appellant

Deanine Reed and Linda Jean Whetstone. Reed also contends the trial court erred in excluding

certain evidence. For reasons that follow, we affirm.

Whetstone died intestate on April 13, 2016. Her house in Dallas was sold in a foreclosure

sale in December 2016. In February 2017, Reed filed an application for determination of heirship

and for letters of administration in the probate court. Reed alleged she was Whetstone's common-

law spouse at the time of Whetstone's death. Whetstone's sister, Nancy Rhodes, answered and

moved to set aside Reed's application. Rhodes alleged Reed lacked standing to seek a

determination of heirship because Reed and Whetstone were not married.

A bench trial on the existence of an informal marriage was held before an associate judge.

Reed called three witnesses; Rhodes called seven. The associate judge determined that no informal

marriage existed and signed a judgment to that effect. The presiding judge of the probate court adopted the associate judge's judgment.

In her first issue, Reed attacks the legal and factual sufficiency of the evidence to support the trial court's determination that no informal marriage existed. Reed bore the burden to prove by a preponderance of the evidence that she and Whetstone were informally married. *See In re J.G.S.*, No. 05-18-00452-CV, 2019 WL 336543, at *3 (Tex. App.—Dallas Jan. 28, 2019, no pet. h.) (mem. op.). She argues she established all elements of an informal marriage. Reed was required to show three things: (1) she and Whetstone agreed to be married; (2) after the agreement, they lived together in Texas as spouses; and (3) they represented to others that they were married. *Russell v. Russell*, 865 S.W.2d 929, 932 (Tex. 1993); *In re Estate of Marek*, No. 05-13-01008-CV, 2014 WL 3057479, at *4 (Tex. App.—Dallas July 7, 2014, no pet.) (mem. op.); *see* TEX. FAM. CODE ANN. § 2.401; *see also Obergefell v. Hodges*, 135 S. Ct. 2584, 2607–08 (2015) (same-sex couples have fundamental right to marry in all states). The statutory requirement that a couple must represent to others they were married is synonymous with "holding out to the public." *Danna v. Danna*, No. 05-05-00472-CV, 2006 WL 785621, at *1 (Tex. App.—Dallas Mar. 29, 2006, no pet.) (mem. op.). The existence of an informal marriage is a question of fact to be resolved by the fact finder. *In re LaFredo*, No. 05-18-01034-CV, 2018 WL 4561215, at *1 (Tex. App.—Dallas Sept. 24, 2018, orig. proceeding [mand. denied]) (mem. op.).

When a party attacks the legal sufficiency of an adverse finding on an issue for which she had the burden of proof, the party must demonstrate on appeal that the evidence conclusively proves as a matter of law all vital facts in support of the issue. *Cedacero-Guamancela v. Sustaita-Salazar*, No. 05-18-00083-CV, 2019 WL 289663, at *1 (Tex. App.—Dallas Jan. 23, 2019, no pet. h.) (mem. op.). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Id.* When a party challenges the factual sufficiency of an adverse finding on an issue for

which she has the burden of proof, the challenge will be sustained only if the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* at *2; *Weaver v. Preddy*, No. 04-18-00026-CV, 2018 WL 6331063, at *1 (Tex. App.—San Antonio Dec. 5, 2018, no pet. h.) (mem. op.).

*Reed's Evidence*

Reed and the two other witnesses who testified on her behalf, Michelle Skyers and Connie Brenners, testified about a marriage ceremony between Reed and Whetstone that took place at Whetstone's house on June 27, 2015.[1] Five people were present—Reed and Whetstone, plus Skyers, Brenners, and Rebecca Winton. Skyers said Reed and Whetstone made "a commitment vow."

Skyers met Whetstone in the spring of 2015 at a music festival, and at that meeting Whetstone invited Skyers to her wedding that June. Skyers did not talk to Whetstone after their initial conversation until the wedding. Skyers met Reed for the first time at the ceremony and that was the only time Skyers was at Whetstone's house. Skyers had no further contact with Whetstone before Whetstone's death. When asked where Reed was living, Skyers answered that Reed was living with Whetstone. Skyers "automatically assumed" that fact.

Connie Brenners lived across the street from Whetstone and was her friend for eight or nine years. Brenners talked to Whetstone "about every day." Brenners met Reed around March of 2015. Reed and Whetstone were together a lot, and Reed moved in with Whetstone. Brenners testified that Reed lived with Whetstone for about a year before Whetstone died. Reed and Whetstone kept to themselves. After the marriage ceremony, Reed went to rehab for alcohol and was in the hospital when Whetstone died. Brenners spoke to a police officer after Whetstone was found dead in her home. Brenners gave the officer the name of Whetstone's stepmother Beverly.

---

[1] That date was the day after the United States Supreme Court's opinion in *Obergefell* was handed down. *See Obergefell*, 135 S. Ct. at 2584.

She did not think she gave the officer Reed's name. Brenners explained that Reed could not be contacted in rehab. Reed was living with Brenners at the time of trial.

Reed testified she moved to Texas from Michigan to take care of her grandson who was born in August 2014. Before she met Whetstone, Reed lived with her daughter, Sara Brodeur, and her daughter's family in Mesquite, Texas. Reed moved into Whetstone's house in June 2015, prior to the June 27th marriage ceremony. After the marriage, Reed continued to reside in Whetstone's home. Reed stated she and Whetstone "lived together as a committed couple, as spouses." Reed continued to pay her daughter rent after she moved in with Whetstone. Reed testified that her daughter evicted her from her house, even though at the time Reed was living with Whetstone. If her daughter claimed Reed was living in Mesquite after the marriage, it was untrue.

From March 30 to April 27, 2016, Reed was in a hospital in Longview, Texas, for an alcohol problem. Whetstone died during this time. Reed lived with Whetstone until she went to the hospital. After she got out of the hospital, Reed drifted from place to place but eventually went back to Whetstone's house. Reed was evicted from Whetstone's house after someone purchased the house at a foreclosure sale.

Reed stated she and Whetstone "held [themselves] out to the public." But when asked if she told anyone "in the public eye" that she was married, Reed answered negatively. She also said she rarely came out of the house, "[m]aybe once or twice late at night," when she lived with Whetstone. She said they were "a bisexual couple in a neighborhood who frowned upon people who don't do the will of God." Reed testified that Winton, the fifth person present at the marriage ceremony, did not appear in court because she is being threatened.

Skyers, Brenners, and Reed all testified that Winton took pictures at the marriage ceremony using Whetstone's phone. Reed said her phone contained pictures of Whetstone. When asked if

she had any pictures of the two of them together, Reed answered negatively and indicated the pictures were of only Whetstone. No photographs were offered into evidence.

*Rhodes's Evidence*

On April 13, 2016, Dallas Police Officer Susan McLenon received a "deceased person call" and went to Whetstone's address. McLenon interviewed Brenners and Whetstone's stepmother Beverly. According to McLenon, from all indications, Whetstone was single and resided alone.

Reed's daughter, Sara Brodeur, testified that her mother has always had "problems keeping residence." Reed moved from Michigan in late 2014 to live with Brodeur in Mesquite. Brodeur later learned that while Reed was supposed to be caring for Brodeur's children, she was selling prescription medications. This led to Brodeur evicting her mother from her house. When Brodeur told Reed in early December 2015 she would be filing for an eviction, Reed left Brodeur's house and went to stay with Brodeur's aunt. Brodeur identified Rhodes's Exhibit 2 as a judgment of eviction from a Dallas County Justice of the Peace.

Brodeur testified that Reed lived with her from late 2014, or early 2015, to the end of 2015. Reed had no personal transportation. Reed was at Brodeur's house every night. Brodeur never heard Reed mention Whetstone. Brodeur was not invited to a wedding ceremony in June of 2015, and Reed lived with her at that time. Brodeur testified that her mother was not a truthful person.

Casey Stewart lived next door to Whetstone from October 2008 until Stewart sold her house at about the time of Whetstone's death. Stewart considered Whetstone a good friend. Either Stewart or her husband went into Whetstone's house about once a week. Stewart had never seen Reed prior to seeing her in the courtroom. According to Stewart, Whetstone lived alone. Stewart would have known if Whetstone had been married.

Mary Gail Baffard, Reed's sister, testified that in 2015 Reed was living with Brodeur in Mesquite. When Brodeur evicted Reed, Reed stayed with Baffard until she went to rehab. Baffard

–5–

had known Whetstone. She introduced Reed and Whetstone a couple of weeks before Whetstone died. Baffard thought they might get along. She took Reed to Whetstone's house. Reed made Whetstone mad, and Whetstone asked Baffard to get Reed out of her house and never bring her back. Baffard testified Reed and Whetstone did not get married and that Reed never lived with Whetstone. Baffard also stated that Reed was not a truthful person.

Dina Brown used to live near Whetstone in Dallas. Brown moved away, but would often stay across the street from Whetstone at Brenners's house. Around Thanksgiving 2015, Brown was in Whetstone's house several times. From the summer of 2015 to the spring of 2016, Brown never saw Reed at Whetstone's house. She testified Whetstone lived by herself.

Beverly Whetstone, Linda Whetstone's stepmother, testified she never saw Reed living at Whetstone's house and Reed's name never came up in conversations with Whetstone. Beverly was called to Whetstone's house on the day Whetstone was found dead. There was no evidence anyone but Whetstone lived there. She was shocked to learn in the fall of 2016 that Reed was living in the house.

Nancy Rhodes testified that she had a close relationship with her sister Whetstone and was in constant contact with her. Rhodes knew Whetstone was bisexual, but did not know about Reed while Whetstone was alive. Rhodes first learned Reed was claiming to be Whetstone's spouse from the attorney appointed as ad litem for Whetstone's unknown heirs. After that, Rhodes looked for evidence at Whetstone's house to substantiate Reed's claim. There was no evidence Whetstone had a relationship with Reed. Brenners did not tell Rhodes about Reed.

In rebuttal, Reed denied that she had been selling drugs. She also denied that she lived with her daughter instead of with Whetstone. Reed said Rhodes and Beverly did not see her at Whetstone's house because Whetstone did not want her family to know about Reed. Reed again stated she lived with Whetstone as a "common-law married couple."

There was conflicting evidence in this case on all three elements of an informal marriage. Where the evidence is conflicting about the existence of an informal marriage, the conflict must be resolved by the fact finder. *In re J.G.S.*, 2019 WL 336543, at *3. The trial court was free to disbelieve Reed's evidence and credit the testimony of Rhodes's witnesses.

The first element is an agreement to be married. Although Reed and her witnesses testified about a ceremony approximately nine months before Whetstone's death at which Reed and Whetstone agreed to be married, there was evidence to the contrary. Rhodes's position was that her sister and Reed were not a couple, let alone a married couple. Rhodes presented evidence that Baffard, Reed's sister, had introduced Reed and Whetstone just a short time before Whetstone's death. According to Baffard, Whetstone asked Baffard to get Reed out of her house and never bring her over again. Baffard testified that Reed and Whetstone never married.

In resolving the issue of whether Reed and Whetstone represented to others they were married, the third element, the question is whether the parties' conduct, words, or actions are sufficient to constitute a representation to the public that a marriage exists. *In re B.H.W.*, No. 05-15-00841-CV, 2017 WL 2492612, at *4 (Tex. App.—Dallas June 9, 2017, pet. denied) (mem. op.). There can be no secret common-law marriage. *Ex parte Threet*, 333 S.W.2d 361, 364 (Tex. 1960). Secrecy is inconsistent and irreconcilable with the requirement of a public holding out. *Id.* at 364–65. A couple's isolated references to each other as spouses are generally insufficient to constitute a representation to the public that a marriage exists. *In re B.H.W.*, 2017 WL 2492612, at *4.

Reed herself testified that she never told anyone "in the public eye" that she was married. In addition, Whetstone's sister and stepmother had never heard of Reed. Likewise, Reed's daughter had never heard of Whetstone. Further, Stewart, Whetstone's next door neighbor, and Brown, a frequent visitor to the house across the street from Whetstone, never saw Reed at Whetstone's house. Rhodes considered Whetstone to be single.

Reed's appellate brief contains more than a dozen record references in support of her contention that she proved she and Whetstone represented to others they were married.[2] Reed directs us to evidence of the marriage ceremony, suggesting that because there was evidence she and Whetstone represented to three people on one day that they were spouses, the trial court was required to find she satisfied the holding out requirement. Reed cannot show based on this isolated incident, or on her conclusory statement at trial that she and Whetstone held themselves out, that the evidence conclusively established a representation to the public that a marriage existed. *See id.* Nor can we say the evidence is factually insufficient to support a finding that there was no holding out.

There was also conflicting evidence on the second element of whether Reed and Whetstone lived together as spouses. Reed testified she and Whetstone lived together in Whetstone's house as spouses. Rhodes presented evidence that Reed was instead living with her daughter Brodeur and her sister Baffard during the relevant time. Again, conflicts in the evidence about the existence of an informal marriage must be resolved by the fact finder. *In re J.G.S.*, 2019 WL 336543, at *3. Reed cannot establish as a matter of law any of the elements of an informal marriage. And after reviewing the entire record, we cannot say the trial court's determination that Reed failed to meet her burden to prove an informal marriage is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See id.* We overrule Reed's first issue.

In a second issue, Reed contends the trial court erred in excluding evidence documenting her stay in a rehab center. Reed identified Plaintiff's Exhibit No. 1 as her "inpatient claim for

---

[2] Although Reed cites alleged evidence of holding out, she also states in her brief that she and Whetstone "did not hold themselves 'out to the public.'" Reed asks this Court, in evaluating the evidence of holding out, to take into account the fact that the couple was "fearful that just to be seen together would put them in harm's way due to the horrific conditions of hatred that permeated the atmosphere of the State of Texas." Reed does not provide any record reference to evidence in support of this statement. Nor does she cite any legal authority that would create an exception to the holding out requirement.

Further, in her briefing, Reed suggests the trial court's failure to find a marriage in this case was due to the fact that it involved a same-sex couple. There is nothing in the record to support such a claim.

hospitalization." Rhodes requested the complete document. Reed's attorney had never seen the full document, only the one page presented. Citing the rule of optional completeness, the trial court ruled that it would not admit the exhibit into evidence. Reed argues the rule of optional completeness did not render the exhibit inadmissible.

Reed's brief does not direct us to where the excluded document appears in the appellate record, and we have not located it.[3] To preserve a complaint about the exclusion of evidence, the complaining party must present the excluded evidence to the trial court by offer of proof or bill of exception. *See* TEX. R. EVID. 103(a)(2); *Gunn v. McCoy*, 554 S.W.3d 645, 666 (Tex. 2018). Without an offer of proof or bill of exception showing the substance of the excluded evidence, a reviewing court can never determine whether exclusion of the evidence was erroneous or harmful. *Sink v. Sink*, 364 S.W.3d 340, 347 (Tex. App.—Dallas 2012, no pet.). By failing to demonstrate the substance of the excluded evidence, Reed failed to preserve this issue for appeal. *See Williams v. FlexFrac Transp., LLC*, No. 05-16-01032-CV, 2018 WL 1887440 (Tex. App.—Dallas Apr. 20, 2018, pet. denied) (mem. op.). We overrule Reed's second issue.

We affirm the trial court's judgment.


/Ada Brown/
ADA BROWN
JUSTICE

180165F.P05

---

[3] Reed attached what appears to be a photograph of the document as an appendix to her appellate brief. This Court cannot consider documents attached as appendices to a brief if they are not formally included in the record on appeal. *Burke v. Ins. Auto Auctions Corp.*, 169 S.W.3d 771, 775 (Tex. App.—Dallas 2005, pet. denied).



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN RE ESTATE OF LINDA JEAN
WHETSTONE, DECEASED

No. 05-18-00165-CV

On Appeal from the Probate Court No. 3,
Dallas County, Texas
Trial Court Cause No. PR-17-00142-3.
Opinion delivered by Justice Brown,
Justices Schenck and Pedersen III
participating.

In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's January 8, 2018 judgment.

It is **ORDERED** that appellee Nancy Rhodes recover her costs of this appeal from appellant Deanine Reed.

Judgment entered this 20th day of February 2019.